The next case of the morning, United States Commodity Futures Trading Commission v. Southern Good morning. Alright, if you'll hold on while I get settled. Alright, Mr. King for the appellant. Thank you, Your Honor, and may it please the Court. There are five major reversible errors that we have appealed in this case. The first is the Supreme Court has reversed the foreseeability standard that Judge King adopted. The reason that we believe that that is reversible error is because the district court ignored the only explanatory variable for the customer losses in this case, and that was the decline in market prices in silver. And there was no other evidence to dispute that that was the cause, and there was no violation based on the market price of silver that was alleged or that was found. In the context of that argument, do you distinguish between those investors who, as far as I can tell, wanted the precious metal and those who were in the futures market? Well, the futures market, no. Well, let me answer the question. Because those things operate differently, right? Yeah, I think that the second part of your question is you're talking about the futures and options transactions. Right, there were different sets of investors here, right? Some of them, at least initially, wanted futures and options contracts, right? That's right. And some of them wanted the good, the metal, the silver, right? Yes. My question to you is, in terms of your foreseeability loss argument, do you distinguish between those two different sets of investors? I don't, because the proximate cause element was not satisfied for the futures and options for a very specific reason, which is that this was a registration violation. And whether we were registered as a Futures Commission merchant, whether we had to be registered as a Futures Commission merchant, had no impact whatsoever on whether these customers made money or didn't make money on their investment. And so, no, there is no distinction. And so our approximate cause in the entire restitution award, our approximate cause argument goes to the entire restitution award. Well, let's say we agree with you on the people who were part of the unregistered futures scheme. But what about those who wanted to buy metals and, in fact, just got options Why wouldn't the proximate cause still apply to them? Well, the proximate cause wouldn't apply to them because they weren't getting options. Remember, the CFTC's theory in this case, and we disputed it, there was a summary judgment that shortcut our ability to try that issue. But our position with respect to the metals was that the metals existed. The CFTC took the position that these were derivative contracts. And regardless of whether these customers owned a piece of silver sitting in a vault in London or a derivative contract, it was tied to the market price of silver. Wait, wait, wait. Options are different. Options have expiration dates, don't they? Yes. Whereas if I buy a bar of silver, it could sit there 20 years. But if I just have an option contract on silver, it's going to expire. And if the price doesn't go up before my option expires, I'm out of luck, right? That's right. But there was no contention in this case that any customer was buying options with respect to the silver. The CFTC's theory was they weren't buying the physical metal. They were buying a derivative contract in the physical price of silver. But the representation, I thought, claim was that the customers, all but the ones who bought the op knew they were buying futures, thought they were actually buying the metal. That was what the representation was. Well, the representation was they were going to buy physical metal. The CFTC is not and has never claimed in this case that what, in fact, they were buying was futures contracts. It was undisputed that they weren't buying futures contracts. What they were saying was, instead, what the London dealers were offering, allegedly, was a derivative contract or a spot contract. No, but the point is that purchasers thought they were buying metals on account, I mean, actual property. And so, therefore, if the market went down, they could hold the metal and sell it when the market goes back up. And they could do this. So the trading up and down had nothing to do if you're actually buying physical silver. You could just hold it. And that's what they thought they were buying, correct? Yes. And they weren't buying that. In fact, they weren't even buying it, wasn't even being bought through the entity they were dealing with. It was through several other companies in London, correct? Is that correct? Well, we would disagree with that characterization. We believe that there was physical metal that was being offered to them. And that there were relationships between our London dealers and London banks that owned the physical metal. Were your clients able to deliver any physical metal? We had the capability of delivering. Capability. But was actual delivery ever made to any of these investors? Well, to Southern Trust Metals, metal was delivered. With respect to the customers that testified at trial, the customers that traded with the London dealers, none of these customers asked for delivery. They were content. And we told them in the very beginning that the delivery would be made in London or in Hong Kong or in New York. And they were content with that. They didn't want the delivery. They wanted to speculate in the market price movements of physical silver. But the important thing is to answer your question, Judge Hull, even if you accepted the CFTC's theory that this wasn't physical metal, but this was a derivative contract in the physical metal, this was not an option. It was not a futures. They could hold it and trade it just like having the bar of silver in the vault. I think the point I'm trying to make is they didn't think they were buying a derivative contract. They thought they were buying actual metal. Yes. Of which they could take actual delivery. That's right. And our position is- That is, your client, Southern Trust Metals, had already had possession of. Well- I think that's what they thought, based on the representations, that Southern Trust Metals had in its possession this silver and they were buying it, the physical silver from Southern Trust Metals. That's what I think they understood they were doing. Is that- That, I would disagree with that characterization as well. Because the contracts and the account opening documents that we opened with them, that we had a third party dealer that was going to provide financing and that the metals would be delivered in London or Hong Kong or New York. So there was never an expectation that Southern Trust Metals was going to itself have the metals. It was always going to be through an agent, which Dodd-Frank specifically allows for actual delivery to an agent. So that is the representation that we made. And there was no evidence to support that that was a misrepresentation. Because that is what happened with respect to our London dealers. But the proximate cause issue is, even if you wanted to say, customers were misled, they bought derivative contracts instead of physical silver, that had no money or lost money because it was undisputed, derivative contracts are tied to the price of physical silver. So if you have investor A who owns a bar of silver in a vault in London, and investor B who owns exactly the same amount of silver, and that day the price of silver goes up, they both made the same amount of money. If the price of silver goes down, they both lost the same amount of money. And so for purposes- If you have physical possession of it, or your client, Southern Trust, can deliver physical possession of it, you can hold the silver, whether it's being held in New York or wherever it's being held. There was no physical silver anywhere. Well, that was a disputed issue that was decided on summary judgment, which is one of the errors that we talked about. I'm just going to your approximate causation. Oh, okay. Yes. And so why is, if in fact there was no silver for them to hold to wait to the market change, why isn't the failure to deliver the silver the approximate cause of the loss? Because none of the customers, there was zero testimony that any customers asked for delivery to them personally. In fact, some of the customers testified expressly that they didn't want delivery. They didn't want it in their home. They wanted to speculate in the market price of silver. And so that's where we get into the restitution issue. Now, we also have issues with respect to the restitution amount that was awarded because of the CFTC revealed for the very first time in closing argument and in post-trial briefs what that number was. And there was no evidence in the record, no opinion testimony, no calculations to support that. And that should be a reversal on a completely separate ground, that they didn't present any evidence to support the numbers, the amount of restitution that was awarded. And the third point that we want to make, it goes to some of the questions that you've asked me about summary judgment. There was evidence in the record that goes to the core issue in this case that the silver existed, that the London dealers that we had relationships with had the ability to make delivery. That's what they told us. There was record evidence. And the district court in this case ignored that evidence, weighed that in, and changed the complexion of this case. So that was also a reversible error. The other point that we want to make is that the relief, the injunctive relief that was entered in this case was totally out of proportion to what the evidence showed and the district court ignored evidence of our settlement with regulators before this case even started to issue the harshest remedy conceivable, which is a lifetime ban from the industry. And the last point of reversal that we have, several of the issues of fraud, there were materiality issues under Goebel, the misrepresentation . . . Your time is expired, but you were answering our questions. You reserve your full five, Mr. Stukes. Thank you. Ann Stukes. Good morning, and may it please the Court. I'm Ann Stukes here for the Commodity Futures Trading Commission, which I call the CFTC for short. And with me at council table is Karlyn Metzger, who tried the case and is on the briefs. The appellant's narrative in this case diverges significantly from reality. The appellants committed two kinds of violations of the Commodity Exchange Act or the CEA. They committed a wholesale fraud in the metals arena, and they unlawfully brokered illegal futures trades. And they were held liable, rightly so, for a restitution award of over $2 million, a civil monetary penalty, and a lifetime ban on appellant Robert Escobio from ever again participating in markets that the CFTC regulates. I submit that this judgment should be affirmed in all aspects because the district court did not err. Well, let's talk about restitution. What is your theory now, after Bank of America, with regards to proximate causation and what it means? So I think if you ask any law student, any first-year law student in America, what does proximate cause mean? They will say reasonable foreseeability, as this court did in the City of Miami case, and as the Supreme Court talked about in the City of Miami case. I'm not sure that that's right. But . . . Causation is more than foreseeability. It's more. And I think it is more, too. Foreseeability is a means by which the law decides whether, as a policy matter, to impose liability, and it's a way to limit and expand liability. But it doesn't . . . it's not causation. You can't ignore the proximate requirement in proximate cause. You can't ignore cause, either. No. Or cause. Because you could have reasonably foreseen something that didn't occur. That's right. And you could have caused something that wasn't reasonably foreseeable. In other words, if Mr. Escobio, here, had not reasonably foreseen any of these losses, could the district court have imposed restitution? Yes, because . . . Then reasonable foreseeability is not the standard, right? I think . . . I will say this. You understand that if you adopt that standard and get us to adopt it, in some cases, you're going to be out of luck? I don't think the standard is simply reasonably foreseeable. Then what is it? I think it's more. I think it is that the conduct, as the court held in the City of Miami, has to be both reasonably foreseeable, but also proximate. And that means not to attenuate it from the violation. It has to be the but-for cause, doesn't it? I think you need but-for and proximate. Okay. But if you need but-for, the fact that, as to the people, the investors who wanted to buy futures, they got what they bargained for. They may have had to go through Loralee and Buckley and Handtech, but they got their futures. So the fact that the defendant was unregistered really didn't cause their loss. I disagree with you, Judge Gilman, and I'll tell you why. In this country, if you want to broker futures trades, you have to be registered with the CFTC, and that is because the law of this country imposes requirements to safeguard both the markets and the market participants. I understand that, but that isn't what caused their loss. Yes, I agree. What caused their loss was the price of silver dropped, because they got what they bargained for. Well, no. In the illegally brokered futures trades, these customers were placed at risk because they entered the market in an illegal transaction. In order for the CFTC to regulate in this market, we have to have people registered. You're saying then that any registration violation automatically satisfies loss causation? I'm saying that- Right? Because the failure to register doesn't let you regulate, and that's the evil you're trying to regulate against. So every time you've got a mere registration violation, you've proven loss causation, even if the customer got the actual contract that he or she wanted. I don't explain it that simply. If I may explain, I'll tell you how I see it and how I think the law operates in this arena on registration violations and proximate cause. The moment these appellants accepted money to broker an illegal futures trade, they violated the law. The moment they charged their customers commissions and trading losses for these illegal trades, they proximately caused the losses. Losses for the commission or losses for the ultimate loss? For the futures customers. For the customers who wanted to trade futures, the appellants violated the law by brokering those trades illegally. If those customers had bet correctly on the market and won, would there be any loss? If they won, if they were in the money, maybe there wasn't a loss. Then the registration violation doesn't lead to a loss finding. It was. Right? No, because they charged them. They charged them commissions. I know, that's why I asked you. I understand, I completely understand the argument that if you have a registration violation, even those customers who got the futures contracts they wanted might have a loss as to commissions charged by an unregistered broker dealer. But what about the ultimate loss at the end of the transaction? I submit that that is a loss that the customers suffered that were caused by the violation because had they not illegally brokered the trade, the customers would not have suffered. Well, they would have gone elsewhere to get the transaction. Well then they would have done it legally. They didn't do it legally. And they still would have suffered a loss. Right, because if the price dropped, they would have lost no matter who they brokered through, even a licensed broker, right? That may be so, but the fact of the matter is. Well, I understand. Let's go to the, I'm more worried about the leveraged metal scheme. Okay. Because Ms. King says that, well, these were derivative contracts and not options. Is there a difference between a derivative contract and an option? There is a difference, and these were derivatives. Well, this, in the CFTC's view of the case, these were neither derivatives nor options. This was a wholesale lie. And these customers in the metal scheme absolutely did not get anything. What did they get? They got something. They got thin air. They got tripped. They got their money stolen. It was an elaborate con. The appellants in this case told their customers that they were buying precious metal. And they told them that they were going to loan them the money to buy the precious metal, just like a home mortgage. And in fact, no one in this case ever had any metal. The appellants engaged in this elaborate scheme and charged their customers fees to open accounts. The price of, the purported price of precious metal, interest and fees and commissions, interest on these fake loans that never existed, it was all an elaborate scheme simply to take money from unwitting people. So what happened when they received money from people, they took the money, they filtered it through a British Virgin Islands company, and then this British Virgin Islands company placed derivative positions in its own name in the UK with those two companies called Hentec and Berkeley that you see in the briefs. They're not parties to the case. Hentec and Berkeley never owned any metal. They were engaged in this over-the-counter derivatives trading that you can't do in the United States. So it was filtered through the British Virgin Islands and done in the UK, all in the British Virgin Island company name with no connection to the customers of Southern Trust Metal who were told and believed in this country that they were buying precious metal. There was no precious metal. Those positions in the testimony of the actors in the UK said, no, that we were derivatives trading. We didn't have metal. We didn't make delivery of metal. We don't have metal. And neither did Southern Trust. So the metal scheme is quite simple to understand. It was an elaborate lie. Every penny that the customers put into that by purported thinking they were buying precious metal, they should get back. They should be returned to their status quo before they ever had the misfortune of coming across these appellants, irrespective of what the market price of silver may have been doing. They must have gotten monthly statements or something, didn't they? We believe they did. However, in this case, the defendants never produced a complete set of their customer statements. So it was impossible to piece together, penny by penny, what every customer put in and what they got back. So in calculating the restitution award in this case, we came up with a reasonable approximation, which is what the law requires, by looking at the trading losses that these UK firms were charging to the appellants as an approximation of losses that the defendants were charging their customers. And the defendants were also charging their customers for fees and interest and spreads and all manner of charges that their salesmen testified were split 50-50 with the salesmen, who were like telemarketers, the salesmen. When the salesmen were paid, they were paid 50% of the fees and the commissions and charges that Southern Trust was charging their customers. So if we took a look at the W-2s of the salesmen, they said that half of that was the fees and the commissions, that their pay was 50% of the fees and the commissions, so we doubled that to reasonably approximate the fees and commissions that customers were charged, and we looked at the trading losses that the appellants suffered in their UK accounts. Where is the best exhibit or document or evidence in the record of how you calculated on the metal scheme the $1.5 million? It looks like you did $1.5 million on the metal scheme and then about $559,000 on the futures. Is that correct? That's right. Okay. Where do I find how you calculated, just approximately, what went into the $1.5 million? How much is fees? How much is interest they paid? Where do I go find that? After the trial was over, when we were briefing the damage calculator, the restitution calculations, we submitted summary exhibits at record 164-1, 164-2, 164-1, 164-2, and 164-3. These were the calculations that we attached to our restitution award briefing. Those are the calculations that we computed based upon all of the statements and evidence that was admitted in the record. Those statements . . . Those are summary exhibits of underlying documents admitted during the trial? Yes, Judge Howell. That's exactly what that is. The evidence that was admitted at the trial, there were voluminous, thousands of pages of statements. We presented, as the district court invited us to do, an argument about how the calculation was done. You're saying there was just an absolute, total misrepresentation for the metals per investors? Yes, Judge. They didn't get options? They didn't get derivatives? They didn't get metals? They got nothing? They got snookered is the way I see it, yes, Your Honor. They got lied to and they didn't get anything, which is why these loss causation cases that the appellants cite are so off point, if you know what I mean. These loss causation cases are about a misrepresentation or an omission that once it comes to light later causes the value of the investment to drop. That factual scenario is absolutely not what happened here in the metals scheme. In the metals scheme, customers were told they were buying metal and they weren't buying anything. They were buying the privilege of being ripped off and all the appellants did was keep a book entry of what they were telling their customers and then they charged them with all this elaborate window dressing, oh, here's the interest on your loan, here's the price spread because the price of silver has been moving. It was all an elaborate lie. You're saying that if, say, the price of silver had gone up and set it down, you're saying these customers never would have received anything? If the price of silver had gone up, there was a risk, I suppose, that the appellants would have owed their customers money and that's why they were hedging in the UK to cover the risk to themselves in case that happened. But the way they operated with fees and commissions, all these high charges for the privilege of being ripped off, the customer's virtually never in the money. There was so much money siphoned off even if they were buying some metals, it wouldn't have been enough to buy the amount of metals they were representing. That's the way we see it, Judge Howell, and I will commend to you . . . They were paying the telemarketers 50% of all the fees and charges that were pulled out of the customer accounts. The telemarketers got to keep 50% of that. Can I tell by looking at some of these summary documents how much money purchasers paid SunTrust Metals? Is that $1.5 million? How much of that? I know you took out the fees that they got paid, so that had to be money the purchasers put in. In terms of the bank accounts, how much of the $1.5 million represents . . . I know they diverted it to different places, fees, interest charges, etc., and maybe some to buy the margin trading they were doing in the derivatives. I don't know. How much went into their bank accounts from the purchasers? Is that $1.5 million? I wish I had a . . . to the penny. I'm not talking about to the penny. No, but I mean I wish . . . A reasonable approximation. I wish that we had . . . what we have, the reasonable approximation is the people who tricked into this metal scheme, they bought the metal, they paid a purchase price for it, and then they paid all these fees and things. Was that above the purchase price? How much cash did they put in the deal? I don't know because we never got complete records from the appellants on their customer account statements. They destroyed them when they were under investigation. They destroyed a lot of the records, so we didn't get a complete set. What we did under the law by calculating the reasonable approximation, when we were trying to figure out the so-called trading losses that customers suffered, we used trading losses that the appellants suffered on their derivative contracts. Assume you came up with roughly a million and a half for these metal investors, right? Yes, that is what we came up with. Right. Yes. I know my time is up. I want to say on proximate cause for the losses on the metals trading, there is no attenuation here. There is no concern that this is far afield from the violation. Every penny that those metals customers lost, they lost because the appellants made up the losses and charged them for something that they never bought. We understand your position. Your time has expired. Mr. King? Thank you. First of all, her answer on the causation element is transaction causation. It's not proximate causation. The standard that we have here is given to us by Congress in Section 13A1. It is a statutory standard of restitution that the CFTC previously never got. The language that they used for that, that customer losses proximately caused by a violation is lifted directly out of Dura Pharmaceutical. This is loss causation. That is the standard that Congress required. It's not just, hey, I never would have entered into this had I known all the truth of whatever they're alleging. I never would have done business with you if I thought that you were an unregistered . . . Do documents exist to show how much money your client took in from customers, or they're no longer around? She has said that we destroyed . . . That's not my question. Are there documents that show how much money you took in from customers buying metals? Yes. But . . . Does government have the documents, or you just have them? The government has them. The government has them. The government has them. The issue that we have is there was never any . . . What do those documents look like? What are they, account statements that were given to the customers? What are the documents that would show what the customers paid? Account statements by Southern Trust Metals that were given to the customer. The CFTC also has account statements from the London dealers, from Handtech and Berkeley. They had 100% of this. They had been doing calculations up to trial. We were never able to take discovery in that. At trial, they put none of their calculations into evidence. I was surprised that she admitted . . . The account statements of the customers didn't get admitted at trial? Those account statements were admitted into trial. What the customer losses were, and what money they put in the transactions is shown in the account statements then. Is that correct? The account statements for Handtech and Berkeley were put into the evidence. The account statements, I don't believe they ever admitted into evidence the account statements from Southern Trust Metal, except for the specific customers who testified. Their account statements were in evidence, and it showed that all the customers got their account statements. There wasn't a single allegation in this entire case. We understand. You gave them account statements. The question is whether the metals were there that you had delivery of, or actual possession of, that are reflected in the account statements. How many customers testified? Five customers testified. Nobody complained about not getting account statements. Nobody complained that we asked for metal and we didn't get it. The only thing they really complained about was we lost money, which is not the violation. It goes back to our original point, which is, look, the losses in this case were caused by declines in the price of silver, and that was not any violation that was alleged in this case. Applying the standard that the statute gives us, they're not entitled to restitution. There is no statute that says any violation of the CFTC Act entitles you to restitution. They didn't do that. But I want to address also this issue of fake loans and fake transactions. It goes to your question, Judge Hall. There were thousands of account statements in record. They showed transactions in the subaccounts with the London dealers. I want the court to understand that. There was a subaccount with the London dealers that was designated for each and every single customer. In that subaccount, the transactions were made, and the CFTC admits that those transactions were reflected immediately in the account statements of the customers. Nobody disputed that. So for them to say the transactions weren't real and the loans weren't real, customers got the benefit of these transactions. One of the testifying customers admitted he had a $7,000 gain within the first few weeks of his opening the account. That all goes to whether they were purchasing right to buy and sell or whether they were purchasing actual metal. We believe they were. At the end of the day, you say, well, the reason they didn't get the metal is they never asked for it. They never asked for it. They never wanted it. They never asked for it. They gave them money, and they never asked for the metal they bought.  That's really what you've said. We would certainly return all the money, and if they had gains, they had gains. These were not fake transactions. These weren't fake loans. We would ask the court to reverse the restitution and reverse the summary judgment. Thank you. The last case in the morning, Mr. Gray.